The first case for argument this morning is 18-1933, Genentechs v. Hospira. Mr. Fletcher, good morning. Good morning, Your Honors. Thomas Fletcher for Appellant Genentech. The Board's first two mistakes in this Interpartes Review concerned its analysis of anticipation, and the same theme pervades both mistakes. The theme of failure to follow this Court's precedence. The first failure to follow this Court's precedent concerns the Court's construction of the term about 18 degrees Celsius in the claimed methods. I'm sorry to interrupt, and I'll let you pick up where you are, but just a sort of technical housekeeping question in connection with this and your other arguments, which is you've got eight grounds here, and five of those at least implicate Claim 1, which is the major representative claim here. So I'm just trying to figure out how many, I mean, let's assume that the claim construction, you're right on the claim construction, and we agree with that. We've still got a lot to overcome, right? Yes. So can you, when you're talking about claim construction, can you be more precise in terms of which of the grounds that would affect and not affect, and then make sure you reach the ones, even if we agree with you, that are implicated here? Okay? Certainly, Your Honor. Yes. I think the Court's final written decision can be analyzed under four headings, and the Court's, the PTAB had two anticipation grounds, and one of those is completely disposed of by the about dispute. But not the other. That's anticipation. The W0389 isn't affected by the claim construction, am I right? It's implicated, but anticipation doesn't resolve that issue. Your Honor's correct, their power challenge. If we were to affirm the W0389, that would end the case completely, right? And we wouldn't have to confront the claim construction question you're leading with. Is that right? It would take care of the anticipation grounds. You'd then need to get to the obvious misanalysis. For some of the dependent claims? For some of the dependent claims, yes. Okay. So, maybe I'll move on to the problem with W0389 and the anticipation issue there. And I think the problem is an inappropriate interpretation of this Court's Kenametal decision. I think this Court's Kenametal decision has already been recognized to have been misunderstood by the PTAB, and this Court in NIDAC-Motor pointed out that the PTAB was not interpreting it correctly. And so, to read from NIDAC-Motor, this Court said, Kenametal does not stand for the proposition that a reference missing a limitation can anticipate a claim if a skilled artisan viewing the reference would at once envisage the missing limitation. But if we go to the PTAB's final written decision at Appendix Page 17, the PTAB is citing Kenametal for precisely that proposition, that it can find anticipation based on what the person of ordinary skill would envisage based on reading the reference. Well, let me ask you, Kenametal, I mean, that's a quote out of Kenametal, at once envisage. A subsequent panel opinion can't overrule a prior opinion, right? So, we can't ignore Kenametal just because some subsequent panel may have said, well, I don't agree with that language, right? You're correct that a subsequent panel cannot overturn a first panel, but I think a subsequent panel can explain the context for the prior panel's holding. And in Kenametal, there is a very small group of elements from Column A and a very small group of elements from Column B in the dispute concerned whether that reference disclosed the combination of a particular item from Small Group A and a particular item from Small Group B. And this court said, these are very short lists. All of those combinations are disclosed because that's what the substance of that disclosure meant. So, we understand Kenametal and the whole principle of, can one of ordinary skill in the art of reading a reference at once envisage the convention that is claimed. Can we take that now to your case? What happened that went wrong here with your case? Certainly. The reference says you do this protein A affinity chromatography step at about 10 degrees Celsius to about 18 degrees Celsius, right? And then we've got W0389 that says, let's do this protein A affinity chromatography at room temperature, 18 degrees Celsius to 25 degrees Celsius. So, then W0389 says, all the steps are being done at that temperature. So then the board interpreted that as, aha, we've got the 18 degrees overlapping in the disclosed in the prior reference in the claimed invention. And so therefore, we have anticipation here. Yes, and I think your honor, the flaw in the analysis there was that the allegedly anticipating reference W0389 says all steps carried out at room temperature and then gives this range for what it considered room temperature, a very chilly room there. The problem lies in the fact that as the board recognized at appendix page 20, that's not a disclosure of the temperature of the fluid that's being put onto the column. It's undisputed amongst the experts and nobody distinguished or... I thought the board had two rationales. One was this reference says all the steps in W0389 are being performed at 18 degrees to 25 degrees Celsius. And so therefore, that means as supported by the petitioner's expert, that every single component of the technique is going to be done at 18 degrees Celsius, including the HCCF composition that's flowing through the column. And so that's theory number one. Theory number two is even if that HCCF formulation is at initially a warmer temperature than like, say, 37 degrees Celsius, by the time it gets poured through the column during the chromatography process, it's going to cool down because everything else is at anything between 18 to 25. And so it'll equilibrate down to the very temperature that's being discussed. So those are really two different theories. One is based on reading the reference expressly. And then the second one is perhaps more of an inherency theory that inherently, the HCCF is going to go down 18 degrees Celsius. Yes, Your Honor, they did have those two headings in there. So what's wrong with the first one? Why isn't that supported by substantial evidence? We have a reference. It could be clearer, but then they have expert testimony explaining that no person of ordinary skill in the art, understanding that they have to do this experiment according to W0389 at a particular temperature, is going to throw in some kind of formulation at a super hot temperature that throw off the entire requirements of what the temperature should be for the technique to occur. And the problem with that, Your Honor, and why it's not supported by substantial evidence goes to, I think, the fact that the board is just quoting from the petitioner's expert's reply declaration. And in fact, when he was actually cross-examined prior to submitting his reply declaration, he conceded that there's no guarantee that any of this material has cooled to room temperature. That makes sense given that the point of these industrial processes is to keep this moving. Take this material that could be getting degraded or breaking down and get it purified. And it starts warm and then gets purified. So he testified under cross-examination that it's not inevitable that it would be cooled down and then submits contradictory reply declaration testimony. Now I suppose the board could have chosen to credit the reply declaration testimony, but it needs to grapple with the fact that when the man was actually put under oath to testify in response to our questions, he agreed with us. I think that's a proposition that flows from your In re Cotsab case, that you can weigh the evidence and come out on one side or the other, but you have to actually do the weighing. And I think it's particularly problematic to credit an expert's reply declaration over their cross-examination testimony without even so much as an acknowledgment of the contradiction. What about the 103s? Certainly. So switching to the 103 analyses, Your Honor. Was it known in the art that proteolysis was temperature dependent? That I think is not a finding that we are challenging on appeal. We challenged it below, but they made that finding. So then the board found that it was therefore known in the art that temperature was a result effective variable. Yes. And so I'd like to address that because there are two different obviousness rationales. Both of them fall under this invocation of, oh, this would all be routine. And so they did it based on temperature, and they did it based on another variable called binding capacity. I'll start with temperature. With temperature, the problem is one of incompatible findings. So yes, they found that temperature affects proteolysis. They also found that leaching is undesirable because it generates this very small amount of a antigen that would be bad for humans if you inject it. And then they also found that at laboratory scale, you can control the temperature of these solutions readily. The problem is you can't take all of these individual findings, put them together, and form an ultimate conclusion of obviousness because it was unrefuted that, in fact, controlling temperature at the scale of industrial purification was an extremely burdensome task that nobody was doing. And so when you try and piece the board's findings together, they don't actually add up. And that's what's wrong with that temperature analysis. I mean, I don't recall seeing your patent specification talk in these terms about how difficult it is to control temperature. I think we put in the expert testimony on that. And it's not a matter of that we had to invent new ways of refrigerating. It's that it's extremely expensive and it adds time and equipment to the process that isn't normally there if you just proceed to purify warm cell culture fluid. Is that true also for laboratory scale usages of this claimed invention? And this is where the purpose of the motivation is so critical. At laboratory scale, you're not making a human therapeutic. You don't care about leached protein A. The amount of leached protein A in the solution that comes out at the bottom is, as we said, literally measured in nanograms. The only reason it is of any concern is if you're going to turn around and inject it into a patient. But if you're just performing laboratory benchtop analysis, the presence of that leached protein A is irrelevant to you. That also wasn't refuted in the record. So that's the problem with the temperature-based routine optimization rationale. If I could just briefly address the second routine optimization rationale. Here they relied on a single paper from a decade before the priority date suggesting that temperature could also affect how much the column could bind. That's what I'm asking. Are we talking about Van Sumeren? That's correct. This is the obviousness over Van Sumeren. And the problem there was that obviousness must be analyzed as of the time of the invention. That's clear from the statute. And in that intervening decade, there were multiple publications explaining how to optimize the protein A process. And several of them acknowledged the fact that this Van Sumeren paper was out there and proceeded to say, that's a bad idea. Changing the temperature can affect product quality. Here are the parameters along which you should optimize your protein A process. And these are the parameters that will result in a good protein A process. And I think the fact that over the intervening decade, you find no examples even hinting at the idea of optimizing on temperature goes to show that this is a hindsight-infected pharma case. The fact that there's so much time between the purported disclosure, the motivation that would make this all obvious and routine, and the actual invention goes to show that you can only go back and look at that earlier reference and say, oh, it's also clear and routine through the use of hindsight. OK. You're interrupting. Yes. I see that. Sit down and we'll restore some of that. Thank you. Mr. Malari? Good morning, Your Honors. May it please the Court, Thomas Malaro for the Appellee Hospira. The judgment of the Board was grounded on multiple independent bases. There were two different anticipation references with two different sets of issues surrounding them. There were also obviousness determinations on multiple grounds. And those obviousness determinations have several independent bases to them. One is an obviousness determination based on the control of temperature for improving proteolysis. Second is the motivation to improve binding capacity. And third is obviousness that comes from the fact that there is no criticality to the claimed range. That is something that Genentech has conceded on appeal. There's absolutely no criticality to the claimed range. Going on to some of the arguments that we heard today, for example, on the W0389, the other side's talking about how your expert was saying contradictory things, and so therefore we can't find that there's substantial evidence to conclude that all of the steps in W0389 would in fact be performed at 18 degrees Celsius. Yes. On W0389, the board found that there was substantial evidence on two different bases. One is the reference itself says all steps carried out at 18 to 25 degrees C. The other aspect of the board's decision is where counsel, I think, is relying on the testimony from Dr. Probitzian. And Dr. Probitzian's testimony was that in fact the temperature of all of the components would equilibrate over time to that 18 to 25 degrees C, even if one were to assume that you didn't start with fluid at 18 to 25 degrees C. So on the first round of the board's decision, Dr. Probitzian testified, and it was adopted by the board, that no one would ignore that direction from the reference to operate at 18 to 25 degrees C and do what Genentech speculates that the reference might be allowing, which is starting with composition that's not at 18 to 25 degrees C. In fact, Genentech's expert, Dr. Kramer, testified that he was unaware of any commercial process in which one did what Genentech postulates that the reference might be teaching here, which is starting with warm HCCF that's not been equilibrated. To run it at 18, don't you always need some sort of external cooling, particularly on this theory of equilibrating at 25? Well, it depends, I guess, on the temperature of the surroundings and perhaps in Washington, D.C. These are not uncontrolled. These are industrial processes in a structure where the temperature of the surrounding is controlled. But even so, to run it at 18, wouldn't you have to assure that there is some mechanism for cooling the ambient temperature? If the ambient temperature were higher than 18, then there would have to be a cooling mechanism. And Dr. Probitzian testified that those cooling mechanisms were, in fact, known in the art. And Dr. Kramer acknowledged that those cooling mechanisms were known in the art. So there were steps that could be carried out conventionally. And, in fact, the patent itself, Your Honor, the specification at certain points says to carry out at 15 degrees. And there's absolutely no mention of any special cooling equipment that would be used because, in fact, it was conventional. Does it have to be mentioned? 15 degrees is obviously below normal environmental ambient temperature. And at 15 degrees, the cooling, if there were something that was unconventional about how one would do the cooling, the patent would be expected to say what you need to do. But because it's conventional to be able to cool to temperatures in this range, the patent doesn't mention it. And, likewise, one skilled in the art wishing to follow the reference W0389 would also understand how to operate at 18 degrees. That's just simply something one skilled in the art could do. Your point is the prior art reference encompasses performing all these steps at 18 degrees Celsius. It explicitly teaches that. That's correct, Your Honor. And as to the point of Dr. Probitzian's testimony that was cited, Dr. Probitzian made quite clear, and this is at A946, that all materials would be equilibrated so that you would obtain robust data. And, in the end, the reference explicitly teaches 18 to 25. And if the reference were, in fact, telling you to do something different, which there's no indication that it is, then everything would equilibrate, as the Board found. There are, as was pointed out, three different wash steps that the reference teaches after you pour the fluid in. Before you actually elude out the purified material, there were three washes, so it's not as though the reference was teaching something that was instantaneous. As far as the obviousness is concerned, the motivations were well supported by the findings of the Board. On reduction of proteolysis, there were teachings specifically in the prior art that protein A leakage in this sort of chromatography process was known and that decreasing temperature decreases proteolysis. And that was at the Pottier reference, at Appendix 592, and specifically at 594 to 95. Dr. Probitzian testified that one skilled in the art would know to balance the benefits of improving proteolysis against the costs that might be associated if cooling needed to occur. And the Board credited Dr. Probitzian's testimony on this point, on all of these points, at Appendix 36 to 37 and also at Appendix 30. There was some mention of a commercial process being the process where you might care more about controlling proteolysis. The claims themselves are not limited to a commercial process, of course. They're open to protein A chromatography generally. But there also was evidence at Appendix 977 in particular that it was conventional and routine optimization to, in fact, cool in these larger processes. You think it would make a difference if the claims included a reference to the scale of the process? It would not in this case, Your Honor, because of the fact that it was not. Why are you telling us you just said that it did, that the claims don't cover a commercial process? The claims cover a commercial process, Your Honor, but they're not limited to a commercial process. And if the claim were limited to a commercial process. I want to know why that makes a difference. Because the claim covers both a lab-scale process and a commercial process. Counsel's argument for non-obviousness, Your Honor, is directed to a commercial process itself. But, in fact, the subject matter covers the non-commercial process. In fact, the Board found that even in the commercial process, it was routine to do the cooling and specifically identified refrigeration of the fluid, jacket cooling, water baths, and cold rooms. And that's at Appendix 977, which was credited by the Board at Appendix 39. Dr. Kramer, Genentech's expert, admitted that these techniques were, in fact, available in the art at Appendix 1080 and acknowledged that the patent doesn't provide any specialized teaching of cooling because, in fact, that is something that is conventional even on a commercial-scale process. And that's at Appendix 1081. On improving the binding capacity, the Van Sommer, in reference, teaches improving binding capacity by controlling temperature. The Board credits that testimony. And the argument from counsel is that there were later papers from Farner in 1999 and 2001 that somehow discredit the Van Sommer in teaching. In fact, those two papers do not discredit the Van Sommer in teaching. They specifically say that temperature control is one way of improving binding capacity, and that's at Appendix 1294 and Appendix 1312. And, in fact, both of those papers cite the Van Sommer in paper approvingly. There's no criticism of the Van Sommer in teaching in these later papers. And so while obviousness must be measured, of course, at the time of the invention, what we had was a situation where Van Sommer taught that temperature could improve binding capacity, and that was approvingly cited by the two Farner papers, which also listed other variables that could be controlled. And this Court has made clear that simply listing multiple variables without criticizing any one particular approach does not constitute a teaching away. And so while there were multiple ways that one could improve binding capacity, the Board was perfectly appropriately identifying that, in fact, binding capacity was something that could be improved, and one skilled in the art would have been motivated to do so. You're not defending the plus or minus three degrees limitation? Yes. On the plus or minus three degrees on the anticipation by Van Sommer, the Board's ruling was, in fact, correct. That's a very reasonable construction, and the Board based that construction on the intrinsic evidence primarily. The Board cited to the specification which, when controlling at 15 degrees, specifically cited plus or minus three degrees. And then the intrinsic prosecution history, there were amendments where the claim originally recited about 20 as the upper limit. There was a rejection over prior art reference that taught about 22, and ultimately the claim was amended to the upper limit of about 18, and that was deemed to distinguish the reference. And, in fact, in the European counterpart patent application, the explicit statement was made that the reference to about 18 did not capture 22. And so the plus or minus three was both supported by the specification and the context of the prosecution history, and certainly under a broadest reasonable construction standard ought to be affirmed here. I see that I've exceeded my time. Are there any other questions? Thank you. Thank you, Your Honor. Good morning. Well, you're here from the PTO, and you're here to argue the retroactivity question? Yes, Your Honor. Of course, this Court's opinion last week in Celgene forecloses of the takings clause challenge, this Court held that retroactive IPRs is not an unconstitutional taking. The brief suggests but does not really develop a separate argument under the due process clause. Of course, as Your Honor mentioned, they have not pressed that here today. To the extent that they do make a separate argument under the due process clause, Celgene's discussion and reasoning demonstrates why that argument is incorrect. Congress had a rational basis to apply IPRs to all patents in existence at the time, and that's all that's required to satisfy the due process clause. I'm happy to cede the rest of my time unless the Court has any other questions. Thank you. Thanks very much. I'd like to focus on three brief points in rebuttal. Counsel for Ospira cited the testimony of Dr. Kramer that he was unaware of any commercial process working in the way that we described the W0389 process. Of course, there's no discovery in a PTAB regarding commercial processes, and so he had no foundation on which to find one way or another. But we can look to Appendix 1733, which is the presentation that Genentech gave of this research at the American Chemical Society, where it's stated explicitly that the temperature of the culture fluid was about 25 to 30 degrees when loaded onto the protein A column. I think that disposes of that point. The presentation from which that citation comes, I think, looms large over this. The PTAB discredited it, didn't give it much weight, because of purported insufficient evidentiary development. But I think it's really important when this court considers the ultimate conclusion of obviousness, and specifically the conclusion that this work was routine, because that's the basis on which all the obviousness grounds rest, that this work was routine. The fact that in 2005 the American Chemical Society chose this research for presentation at its national meeting, I think objectively eviscerates that rationale. The American Chemical Society is not interested in hearing about routine research. Very briefly, then, the comment from Hospira that the prior art publications approvingly cited van Someren. That's not true. At Appendix 1312, when they cite van Someren, the review proceeds to say controlling temperature is a bad idea because it could affect product quality. So these are the variables to look at. And then lastly, we heard a citation to Appendix 977. That's the reply declaration of Hospira's expert. And I think if you read that paragraph, Hospira's expert disclaims any discussion of industrial scale purification, only talks about the ease of doing it at a lower scale. 1312, does it say stay away from temperature? Certainly, Your Honor, 1312. Just keep reading down. It's the final sentence of the last complete paragraph in the second column. It says, while changes in pH, buffer, conductivity, or temperature could denature, precipitate, or otherwise affect the antibody, changing the flow rate and column length to optimize a bioprocess would have little impact on the antibody itself. The paper then proceeds to talk about optimizing these processes around flow rate and column length. That last point was simply the claims are not limited to a commercial scale, but the motivation of the person's ordinary skill concerns commercial operations. And that's why commercial scale is relevant to the analysis here. It's not a claim scope issue. It is all about the conclusion of obviousness and why the purpose of ordinary skill would have purportedly made the claim to mention. Thank you. Thank you, Your Honor. That side's in the cases submitted. The next case for argument is 18-2003, Erickson v. TCL.